IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-23-306-SLP |
| | ) | |
| ANTONIO LAMURAEL BOYKINS, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

Before the Court is Defendant Antonio Lamurael Boykins's Second Motion to Suppress Evidence[1] [Doc. No. 32].  The Government timely filed a response [Doc. No. 36], and the Court conducted an evidentiary hearing on December 21, 2023.  For the following reasons, the Motion is DENIED.

I.      **Introduction**

Defendant Antonio Lamurael Boykins is charged in a one-count Indictment [Doc. No. 5] with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Defendant was driving in Del City, Oklahoma when two Oklahoma City Police Department ("OCPD") officers identified him as the the subject of an expired radiogram.  The officers then conducted a traffic stop, claiming Defendant failed to signal within 100 feet of a turn. They removed Defendant from the car and placed him in the back of their police vehicle. After smelling marijuana coming from Defendant's vehicle, officers searched the car and

---

[1] Defendant's first Motion to Suppress [Doc. No. 21] was stricken because its attachments contained unredacted personally identifiable information, *see* Order [Doc. No. 30].

found a firearm.  Defendant has moved to suppress this evidence, arguing both the stop and the resulting search were unconstitutional.

## II.      Evidence and Testimony at the Suppression Hearing

In early June 2023, a radiogram issued after Defendant's girlfriend reported that he threatened her with a gun.  The bulletin set forth details about Defendant's vehicle, including the color (silver), make and model (Chevy Tahoe), and license plate number.  The radiogram automatically expired three days later, nearly a month before the stop at issue here.

On July 2, 2023, OCPD Officers Justin Reynolds and Justin Kuehn[2] were patrolling in a marked police vehicle as members of the Violent Crime Apprehension Team ("VCAT").  While the officers were stopped at a gas station, Officer Kuehn noticed a silver Chevy Tahoe at the neighboring car wash.  Although he could not read the vehicle's tag, Officer Kuehn realized it otherwise matched the previous month's radiogram.  The officers decided to follow the vehicle when it exited the car wash.  There were two or three vehicles between the police cruiser and the SUV when the driver of the Tahoe—later identified as Defendant—signaled and made a right turn.  The officers initiated a traffic stop on the basis that the driver did not signal within 100 feet of the turn, in violation of Okla. Stat. tit. 47, § 11-604(A)–(B).

The Tahoe gradually came to a stop.  As the police cruiser also began to slow, bodycam footage captured Officer Kuehn saying he could "smell the weed already."  Def.'s

---

[2] Both officers were promoted to sergeant at some point after the events described herein.  For ease, the Court refers to them consistently as "officers."

Ex. 3 (conventionally filed) at 0:00:36.  Around this time, the officers confirmed the Tahoe's tag number matched the earlier radiogram.  After both vehicles stopped, Officer Reynolds exited the police cruiser and warned Officer Kuehn that the Tahoe's driver was "digging in the center."  Def.'s Ex. 4 (conventionally filed) at 0:00:51.  As Officer Kuehn approached the driver's side of the vehicle, he remarked: "Can you roll these back windows down?  It's hard to see, man."  Def.'s Ex. 3 at 0:01:09.  Officer Kuehn then asked Defendant to produce his driver's license.  Defendant admitted he did not have a driver's license, but he produced a state ID card and a medical marijuana card.

Officer Kuehn removed Defendant from the Tahoe without incident and placed him in the back of the police vehicle.  Officers asked for consent to search Defendant's car, but Defendant refused.  Officer Reynolds then removed the front-seat passenger and led her to the back of the police vehicle.  When Officer Reynolds opened the door to the police cruiser, Defendant asked, "What's this for?"  Def.'s Ex. 4 at 0:04:19.  Officer Reynolds advised the officers could "smell weed" coming from the car.  *Id.* at 00:04:39.  Defendant replied, "I have marijuana on me . . . I had smoked when I was sitting at the car wash . . . ." [3]  Govt.'s Ex. 2 (conventionally filed) at 00:00:36.  Officer Reynolds then searched the Tahoe and found a loaded Glock handgun tucked into the seatback pocket of the front passenger's seat.

---

[3] The officers located "[o]ne burnt marijuana blunt" in the backseat passenger's purse.  Police Rep. [Doc. No. 32-1] at 9.  That passenger told police Defendant had "handed her a marijuana blunt that they were smoking to put in [her] purse."  *Id.*

3

At the suppression hearing, the Government called Officer Reynolds as its first witness.  He admitted the police cruiser's dashcam did not capture the alleged traffic violation.  Nevertheless, Officer Reynolds testified that he could see the entire rear portion of Defendant's vehicle before the turn and claimed Defendant engaged his turn signal about 50 feet before turning right.  When asked how he reached this conclusion, Officer Reynolds testified that he relied on the road's evenly spaced lane lines as a tool to estimate distance.  Additionally, he claimed Defendant signaled as he passed a large tree.  Officer Reynolds testified that he later confirmed the tree was 50 feet away from the deepest part of the turn.  On cross-examination, Defendant's attorney asked Officer Reynolds to approximate the distance between the court reporter's desk and the back wall of the courtroom.  Officer Reynolds estimated the distance to be 100 feet, but Defendant's attorney claimed it was only 50.[4]  Defense counsel also questioned Officer Reynolds about the placement of the police cruiser's dashcam.  The officer claimed the dashcam was mounted above his eyeline, and that the resulting video provided a somewhat distorted view.

Officer Reynolds next testified about the smell of marijuana.  He admitted the Tahoe and police cruiser both had all their windows rolled up prior to the traffic stop.  Officer Reynolds estimated the two vehicles were about 20 or 30 feet apart at the time Officer Kuehn said he could "smell the weed."  Officer Reynolds confirmed that he could also smell the odor of burnt marijuana at this time.  The police report he prepared after the stop

---

[4] Defendant's attorney claimed he "walked" the courtroom prior to the hearing.  Based on the in-court reference to counsel's shoe size, the Court presumes he used the number of steps he took to estimate the distance.

reads: "While standing at the windows of the SUV, Myself and Officer Kuehn could smell a strong odor of burnt marijuana coming from inside of the SUV."  [Doc. No. 32-1] at 9. Officer Reynolds stood by the accuracy of the report even though it did not mention that officers could smell of marijuana *before* the vehicles stopped.

Finally, Officer Reynolds discussed the moments after the Tahoe was stopped but before the officers approached the vehicle.  He testified that he could not see details through the Tahoe's heavily tinted windows.  But he claimed that the summer sun was setting in west—directly in front of the SUV—and he could therefore see the driver's silhouette leaning towards the center console.  He testified that he believed the driver was either digging around for something or trying to hide something.  He claimed that VCAT officers always ask drivers to roll their windows down as a standard precaution for officer safety.

The Government then called Officer Kuehn as its second and final witness.[5]  He conceded that he did not observe the traffic violation, but claimed he initiated the stop based on Officer Reynolds's firsthand account.  He confirmed that he could smell marijuana as both vehicles began to slow down.  He also testified that he did not see the driver reaching towards the center because he was focused on the fact that the Tahoe was slow rolling.[6]  Nevertheless, Officer Kuehn confirmed the position of the sun allowed him to see the broad shapes of the Tahoe's occupants, although he could not make out further

---

[5] Defendant did not call any witnesses at the suppression hearing.

[6] Officer Kuehn described slow rolling as a tactic drivers use to buy time—either to hide contraband or plan an escape—after a traffic stop has been initiated.  Rather than immediately coming to a stop, a slow rolling vehicle gradually loses speed before eventually coming to rest.

details.   He echoed Officer Reynolds's testimony that he asked the driver to roll the windows down as a standard safety precaution.

**III.   <u>Analysis</u>**

Defendant challenges both the lawfulness of the initial stop and the warrantless search of the Tahoe.

### a. *Initial Stop*

The Fourth Amendment protects "against unreasonable searches and seizures." "[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).  Reasonable suspicion requires "some minimal level of objective justification." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)).  "Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances, and an officer's subjective motivation for the stop plays no role in ordinary reasonable suspicion Fourth Amendment analysis." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (brackets and internal quotation marks omitted).  The government has the burden to establish reasonable suspicion by a preponderance of the evidence. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

Defendant concedes the officers could lawfully stop Defendant's vehicle if they had reasonable suspicion that a traffic violation occurred. *See* [Doc. No. 32] at 4.  Nevertheless, he urges the Court to conclude the proffered reason was fabricated because of (1) the pretextual nature of the initial pursuit, (2) the fact that the dashcam did not capture the traffic violation, and (3) the purported discrepancies between the officers' recorded statements and the police report.  Upon review, however, the Court finds these arguments to be without merit, and concludes that the officers' testimony is credible.

To be sure, the officers initially began following Defendant's vehicle because of the expired radiogram.  But, as Defendant concedes, any pretextual motive for the stop "is nullified if an officer sees an infraction of highway law." *Id.* at 7 (citing *Botero-Ospina*, 71 F.3d at 786–87).  Although the police cruiser's dashcam did not capture the traffic offense, it started recording only a split second before the turn in question.[7]  In contrast, Officer Reynolds testified that he could clearly see the rear portion of Defendant's car prior to the infraction.  He further testified that Defendant engaged the Tahoe's turn signal only 50 feet before turning, in violation of Okla. Stat. tit. 47, § 11-604(A)–(B).[8]  Whether Defendant in fact signaled less than 100 feet before the intersection is not the relevant constitutional inquiry.  *See United States v. Tibbetts*, 396 F.3d 1132, 1137 (10th Cir. 2005),

---

[7] The beginning of the Tahoe's righthand turn is captured at the zero second mark of the dashcam video. *See* Def.'s Ex. 2 at 00:00:00.  The sedan directly in front of the police cruiser began to turn around this same time, mostly obscuring the dashcam's view of the Tahoe.

[8] That statute provides, in relevant part: "No person shall so turn any vehicle without giving an appropriate signal . . . . A signal of intention to turn right or left as required by law shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." Okla. Stat. tit. 47, § 11-604(A)–(B).

*abrogated on other grounds as recognized by United States v. Cunningham*, 630 F. App'x.

873, 876–77 (10th Cir. 2015); *see also Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990).

Instead, the Court must consider whether Officer Reynolds had an objectively reasonable

belief that the violation occurred.  He testified that he reached his conclusion by relying on

a stationary object (the tree) and estimating that object's proximity to the intersection using

evenly spaced lane markers.[9]   These particularized facts, considered in their totality,

support a reasonable suspicion that Defendant did not comply with Okla. Stat. tit. 47, § 11-

604(A)–(B).  Nor is the Court troubled by Officer Reynolds's inability to correctly estimate

the length of the courtroom during the hearing (assuming defense counsel's measurement

was correct).  Officer Reynolds testified that he relied on visual clues *on the road*—none

of which were present in the courtroom—to estimate the Tahoe's distance from the turn.

Nevertheless, Defendant urges the Court to discount the officers' credibility because

footage from the encounter contradicts the police report.  But the Court is not persuaded

that these purported inconsistencies—either about the smell of marijuana or the tint of the

Tahoe's widows—have any bearing on the officers' credibility.  With respect to the odor,

both officers testified that they could smell burnt marijuana as they sat in the police cruiser,

before either vehicle came to a full stop.  Officer Kuehn can be heard stating as much on

his bodycam.  On the other hand, the police report indicates the officers "could smell a

strong odor of burnt marijuana coming from" Defendant's vehicle "[w]hile standing at the

windows of the SUV."   [Doc. No. 32-1].   These assertions are not necessarily

---

[9] Officer Reynolds testified that there were about one and a half lane lines between the tree and
the turn, estimating the distance was therefore less than 50 feet.

contradictions.  The report does not indicate that officers *first* smelled marijuana at the car's window, nor would it make sense for the officers to explain with pinpoint accuracy when they were initially able to smell marijuana since that was not the basis for the stop.  Even so, Defendant insists the officers would not have been able to smell marijuana prior to the stop because both vehicles had their windows rolled up.  Instead, he characterizes Officer Kuehn's in-vehicle statement as "a clear indication that officers conferred and agreed on what they were going to say was their probable cause for searching the vehicle prior to stopping, walking up to the vehicle, and any possible discovery they may have made." [Doc. No. 32] at 8.  The Court finds this argument to be both speculative and unlikely.  At the time Officer Kuehn made his statement, the police vehicle was driving slowly, only 20 or 30 feet behind the Tahoe, and directly in its footprint.  Officers located a burnt marijuana blunt in one passenger's purse, and Defendant admitted the occupants had been smoking at the car wash immediately before the stop.  In light of this evidence, the officers' claim that they could smell marijuana before the stop is entirely plausible.

Similarly, Defendant attempts to impugn the officers' credibility with respect to the Tahoe's tinted windows.  But  Defendant overstates the evidence, claiming the "officers clearly say they can't see through the windows when they get out and approach the car." [Doc. No. 32] at 6.  To be sure, Officer Kuehn asked Defendant to roll the back windows down as he approached the Tahoe's driver side window, stating it was "hard to see." Def.'s Ex. 3 at 0:01:09.  But Defendant has identified no evidence supporting the assertion that the officers *couldn't* see through the windows.  The officers' testimony at the suppression hearing corroborates Officer Kuehn's contemporaneous statement.  They both reiterated

that it was difficult to see through the Tahoe's tinted windows, such that they could only make out the broad shapes of the occupants through the SUV's rear window.[10]

Finally, Defendant takes issue with the fact that Officer Reynolds claimed Defendant was "digging in the center," Def.'s Ex. 4 at 0:00:51, while the police report indicated Defendant "reach[ed] over towards the front right passenger seat area," [Doc. No. 32-1] at 9.[11]  But Officer Reynolds testified at the hearing that he could make out only silhouettes, not fine details.  Thus, any nuanced discrepancies between the officer's contemporaneous statement and the police report are immaterial.  The core of Officer Reynolds's testimony—that he could make out the driver's shape reaching toward the interior of the car—has remained consistent with respect to the bodycam footage, the police report, and the testimony given at the suppression hearing.  Thus, Defendant has not provided sufficient evidence to call the officers' credibility into question.  The initial stop was therefore supported by reasonable suspicion "that a traffic violation had occurred." *Botero-Ospina*, 71 F.3d at 788.

### b. The Search

A warrantless search is presumptively unreasonable, but there are several exceptions to this presumption.  *United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018).  The automobile exception permits officers to perform a warrantless search of a vehicle when they "have probable cause to believe there is contraband inside" of the vehicle.  *United*

---

[10] Both officers also testified that they routinely ask drivers to roll down their vehicles' windows during traffic stops as a matter of officer safety.

[11] The gun was ultimately located in the pocket behind the front passenger seat.

*States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004) (quoting *Florida v. Meyers*, 466

U.S. 380, 381 (1984) (per curiam)).  "Probable cause to search a vehicle is established if,

under the totality of the circumstances, there is a fair probability that the car contains

contraband or evidence."  *United States v. Chavez*, 534 F.3d 1338, 1343–45 (10th Cir.

2008) (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)).

It is well established "that the smell of burnt marijuana alone establishes probable cause to

search a vehicle for the illegal substance."[12]  *United States v. Parker*, 72 F.3d 1444, 1450

(10th Cir. 1995); *see also United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015)

(citing cases).  The government has the burden to "show that the agents had probable cause

for their actions, and it must prove probable cause by a preponderance of the evidence."

*United States v. Finefrock*, 668 F.2d 1168, 1170 (10th Cir. 1982).

Defendant argues officers lacked probable cause to search the Tahoe because

Defendant and both occupants had medical marijuana cards.  He cites no Tenth Circuit

cases supporting this view, but instead relies on *State v. Roberson*, 492 P.3d 620 (Okla.

Crim. App. 2021).  But in that case, the Oklahoma Criminal Court of Appeals held that

"[t]he decriminalization of marijuana possession for those holding medical marijuana

licenses *in no way affects a police officer's formation of probable cause* based upon the

presence or odor of marijuana."  *Id.* at 623 (emphasis added).  That court went on to suggest

that "production of a medical marijuana license may constitute an affirmative defense to

---

[12] The smell of marijuana establishes probable cause to search a vehicle for evidence of *marijuana*, but officers need not ignore firearms found pursuant to a lawful search.  *See United States v. Snyder*, 793 F.3d 1241, 1243 (10th Cir. 2015).

the crime." *Id.* at 624.  Defendant was not cited for possession of marijuana, however, and it is unclear how his medical marijuana license would constitute an affirmative defense to being a felon in possession of a firearm—the crime he is charged with here.  *Cf. Assenberg v. Whitman Cnty.*, 730 F. App'x 429, 432 (9th Cir. 2018) ("[A] medical marijuana authorization card was only an affirmative defense to marijuana-related criminal charges.").

Finally, Defendant argues that the Court should place emphasis "on the 'totality' [of the circumstances] in this matter."  [Doc. No. 32] at 10.  But the totality of the circumstances supports the existence of probable cause.  Both officers testified that Defendant was slow rolling prior to the stop.  Officer Reynolds testified that he could see Defendant "digging" around the interior of the vehicle before they approached the Tahoe.  After the initial stop, Defendant admitted he did not have a driver's license and that he had smoked marijuana at the car wash just prior to the stop.  At this point, officers conducted a probable cause search based on the strong smell of marijuana emanating from the vehicle.  This evidence, viewed in its totality, supports the Court's conclusion that officers had probable cause to search Defendant's vehicle.

IT IS THEREFORE ORDERED that Defendant's Second Motion to Suppress Evidence  [Doc. No. 32] is DENIED.

IT IS SO ORDERED this 9th day of January, 2024.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

12